Next, the last case for this morning is 25-2014 Barry v. Bondi, a counsel for a felon. If you'd make your appearance and proceed, please. May it please the Court. My name is Matt Crotty. I represent Will Barry. I'm going to start by addressing the concept of exhausting administrative remedies, and then I will go into the district court's dismissal and how it erred in dismissing the retaliation, discrimination, and then hostile work environment claims. As it relates to the purpose of exhausting administrative remedies, under Title VII of the Civil Rights Act, an aggrieved, once they learn of their, you know, a discreet act against them in the federal sector, they have to contact an EEO counselor or somebody logically connected to the EEO branch. If that doesn't resolve, then at the agency level, they file an agency-level complaint of discrimination. Once that discrimination complaint at the agency level is filed, then the agency investigates the claim. In this case, a complaint of discrimination was filed at the agency level, and the agency conducted a very thorough investigation. A supervisory special agent from the FBI interviewed and got statements from over 17 witnesses and then compiled a 328-page report of investigation that related to allegations that occurred beginning in 2020 and all the way up through 2023. That is the purpose of exhausting administrative remedies, to allow the agency to investigate and then possibly resolve the matter. The purpose of exhaustion is not, and there's case law that we cite in our reply brief, to set up a case for judicial review and also charges at the administrative level that are to be liberally construed. So with that concept in mind, and also with the, you know, the fact that on summary judgment, reasonable inferences need to be made in favor of a non-moving party, I'm going to move into the district court's dismissal of the discrimination and retaliation claims. And to your exhaustion point, though, at the time that Mr. Berry first spoke to the EEO counselor, the EEO counselor noted that his claims appeared to be time barred and that he had no explanation for why he did not respond within 45 days as he was required to do. Exhaustion, it exists for a reason. I mean, you're supposed to raise these claims in a timely manner. He did not. So whether the FBI did an exhaustive investigation or not, or did a comprehensive investigation, doesn't go to the initial question of whether he did what he was supposed to do under the regulations of the agency, right? If we take a step back, though, and look at the, granted it's a district court decision, but it provides a good framework to look and address this exhaustion question that I think the court's getting at, and that would be the Johnson v. Clickman case out of the District of Kansas. And that sets out a three-factor test to determine whether, in this case, Mr. Berry timely contacted somebody associated with the EEO program to begin the process of exhaustion would occur. And in this instance, and I'm going to quote here, the EEO is held that in order to sufficiently initiate contact, the employee must contact an agency official logically connected with the EEO process, even if the official is not an EEO counselor. That's factor number one that I'll get into quickly. And then factor two is to demonstrate an intent to begin the EEO process. And then factor three, to allege that an incident in question is based on discrimination. So let me look at, let me address factor one, which was before the district court, and again, on summary judgment with reasonable inferences in the non-moving party, here's what, here are two policies that was before the district court and that I'd like to highlight. The first is the FBI harassment policy 1038D, and that's on volume two, page 161. Specifically, it's paragraph 5.3, harassment based on race. And paragraph 5.3.2 says, if the employee is afraid of or uncomfortable with confronting the alleged offending party, and this is Mr. Berry back in August, September 2012, the employee, Mr. Berry, the employee is encouraged to report the incident in writing or verbally, he reported it in writing to a higher level supervisor, he didn't do that, and or, here's the important part, to the inspection division, and then this is the key phrase that I can't emphasize enough, to protect all legal rights, and to put the FBI on notice in order to address this behavior. So all legal rights, the employee's all legal rights include rights under Title VII to pursue and vindicate his Title VII rights that were being violated. So you have, that's FBI policy. There was no mystery who the EEO counselor was, and when he was confronted with the time bar, he offered no explanation as to why he didn't do it. Right then and there, he could have said that I was concerned and I did X, Y, and Z, he didn't do that. And why is it not the case? I mean, this structure that he reported under was an internal affairs structure. I mean, those two things are different. I mean, I don't even have to know a lot about the FBI to know those two things are different, aren't they? Well, that's what the district court said, but I would say that... Well, counsel, let me follow up on that. If it's not as Judge Holmes said, when he sent the emails in August of 2021 and September of 2021, that was after the investigation had started and he'd received notification of the WebTA fraud investigation, which was in March of 2021, right? He already knew that at that time. He was aware. And in the emails, did he say anything about his belief that he was being investigated because of some discrimination? Or did he just say, hey, my supervisor is saying some derogatory things that is not appropriate? No, he did not say that in the emails. And to I think the point your Honor is getting at is that... But that's where you want us to believe that the claim was preserved and exhausted, right? In the emails. The hostile work environment claim was preserved and exhausted in those two emails of September and October. The discrimination retaliation claims were preserved on January 11th, 2023, when Mr. Berry went to the EEO counselor, the EEO counselor herself, and laid out what had happened from 2020 all the way up through 2023. The main point that Mr. Berry made when he went to the EEO counselor on or around January 11th, 2023, related to that now he knew, Mr. Berry knew that he was being recommended for termination from the FBI due to this alleged house entry violation. So he knew that, and he also knew, Mr. Berry also knew that at the time, that Mr. Hall and then his replacements, Mr. Fancher, had treated two white, similarly situated people differently. So under Title VII and the case law, right there before the EEO counselor, Mr. Berry brought forth facts that he was in a protected class, he was being treated subject to an adverse employment action, the potential termination, and then he brought any alleged comparative evidence of other people being treated better than him. You said the hostile work environment claim was preserved by those emails. Well, in his EEO complaint itself, there's this box to check for harassment other than sex. He didn't check that box. What do I make of that? I believe there's case law that says that one doesn't look at the actual boxes checked, but they look at the charge, the agency charges. And I didn't see any suggestion of, well, he didn't use those words, nor did he suggest necessarily that he was being harassed. I would disagree. If you look in the two emails, the September and August emails, he does mention hostile work environment. So he might not have said the word harass, but he says hostile work environment, and they're fairly synonymous. But more to the point, though, as it relates to the discrimination or retaliation claims, as of January 11th, 2023, then Mr. Berry timely, once he knew that he was subject to, once he learned of the effect of this investigation that began back in March of 2021, and then, Your Honor, really quick, Mr. Berry and his agency charge, he's saying that the ultimate, that the motive for being subject to this investigation was Mr. Berry having took a knee during, when he was activated in response to the George Floyd protests. So that was the motive that originally led Mr. Hall through Ms. Montgomery, he alleges, to make this house hunting trip referral. It wasn't, because I get your point about the timing, that he made the complaint after he became aware of the investigation. But it's his complaint, and he says it towards the end of his EEOC charge, that it was Mr. Hall and then Fancher retaliating against him for having taken the knee earlier. A fact that both of them were aware of, had expressed discontent about. What I'm struggling with, though, however, is, you know, there are a lot of allegations that, of conduct that, you know, arguably, it's quite offensive. He knew about these things. I mean, he knew about these things in 2021. I mean, why in the world did it take him to the time he went to the EEO counselor if he's claiming that somehow or other, he's been, there's been some racial discrimination against him. He knew about this stuff then. I mean, what light went on beyond the fact that he was being investigated that would have caused him to go to the counselor then that didn't exist prior to that point? As it relates to, the knee was in 2020. The knee was in 2020. The domino effects of that started, began or continued in 20, in August, September 21. And then I believe it's in Mr. Berry's declaration that he, as he made these two complaints to the IPU, which is under the INSD, he was told that, hey, if you keep making these complaints, it's just going to start the process all over again. So that's why he stopped. So that's the answer to the first question. The second part is he hired an attorney once he knew that he was getting, not investigated, but subject to possible termination and an attorney who. Right. He had an attorney with him at the time he filed this complaint of discrimination, right? Yes, after contacting the EEO counselor in January of 2023. The question I have then is, is I understand you're trying to tie this all together and get this sequence of events and to argue that he exhausted and properly timely exhausted his complaints. But in the complaint, it says, these are the words, it says to be clear, comma, Bill and it's Bill Hall, but it says Bill retaliated against me for opposing race discrimination, taking a knee at the BLM protest. But this is in, this is in 2023, right? And he says on account of my race, but then he says that retaliation and the discrimination was by causing the WebTA housing hunting and shrimp fraud allegation to be investigated. And he knew about that in March of 2021, right? But an investigation is not, he did, Your Honor. But that's what he says. That's his complaint. Yes. Not that I was recommended for termination later, but that I was investigated. But there's a, and we cited on page seven of our reply brief, the Lincoln v. MAKETA case, which says that being told that you're under investigation, that is not an adverse action. It is not a discreet act. That didn't, so as a matter of tensor to law, he was not obligated at the time to. So if all that happened was he was just investigated for this, and that was based upon, as you say, racially motivated, that wouldn't be an adverse action? Even if it turned out in his favor, the fact that he had to go through an investigation, that's not an adverse action? Under the caseload I'm looking at, I believe, for these purposes, no. But when he learned that they, the FBI, years later, apparently the process takes some time, but when he learned that the FBI was then going to fire him, he had the facts which he conveyed to the agency that I am being treated differently. I was subject to investigation. Now I'm looking at being fired for this reason. They're similarly situated, non-African American agents that have been treated better by the same alleged adverse action. Counsel, didn't the letter, didn't the letter, the letter didn't fire him, did it? No, the letter did not. The letter said there was a proposal, and then it set forth various procedures he could invoke. Is that, why is, if you're saying the previous investigation wasn't an adverse action, why is this an adverse action when there's been no termination? It's just a continuation of something that you seem to be saying isn't an adverse action. Because now we're looking at a material change in one's job position. As I understand it, Mr. Perry, no. It doesn't say he's being fired. There's a proposal. The letter proposes his dismissal. But with the proposal then, as Judge Hywell was getting at, that's when he had the, you know. Well, I'm trying to find in your complaint where, I mean, the letter is mentioned only once in the complaint. And is there any discussion of it being an adverse action in the complaint? There is. Towards, I believe, Paragraph 80 or thereabouts, that's when, you know, it's alleged that Mr. Berry is informed that he is being subject to termination. And when you're subject to termination, you're not working anymore. You're on administrative leave as you begin to, you know, combat that process. So unlike just under investigation where Mr. Berry was. You're also arguing that what's referred to in the briefing is the non-recognition event. How is that an adverse action? So under hostile? They say that, you know, they didn't have him help with the new folks and instead use someone less experienced than him. I mean, maybe that was a slight to him. But why is that an adverse employment action? It's, I'm going to split some technical hairs here. So an adverse employment action under, which is a discreet act under the Martinez v. Potter case, that's a demotion, failure to promote, a non-transfer to use those 10th Circuit examples. I'll point to the Russell v. Driscoll case of this circuit of this year, where it says a hostile environment claim asserts that a serious. Well, I was thinking of it not in hostile terms, hostile work environment, but you rely on it for retaliation. And there you need an adverse employment action. So how is it an adverse employment action? So under Burlington, Northern Santa Fe v. White, which is a U.S. Supreme Court case that the defense cites, that says a couple points. One, context matters, and I'll get to the context quickly. Two, for retaliation, the adverse action is something that would dissuade a reasonable person from pursuing a charge of discrimination. And the Burlington case gives an example of an adverse action of not being, and I think this is on page 68, 69 of that opinion, it gives an example of not being invited to lunch. So context matters, and here's why that context is important in this case. You have, in this instance, Kalen Fancher. And Mr. Fancher, this was all before the agency when it did its investigation, Mr. Fancher was enraged that Mr. Berry took a knee. That's volume one, page 176. Mr. Fancher was alleged to have said that Mr. Berry should have been kicked out of the FBI because of that. That's volume one, 100 paragraph 29. It was investigated or alleged in the EEO complaint that Mr. Hall discussed in 2021 with Mr. Fancher, having learned of Mr. Berry's emails to the OPR calling him a coward. And you had Mr. Fancher refusing to act upon being told by Mr. Berry that he was being discriminated against, even though FBI policy required it. So that's Mr. Fancher, and then the context is this. You have, so Mr. Hall's gone, Mr. Fancher's there, he's the heir apparent, and so Mr. Berry already knows that the Hall replacement does not like him for those reasons. But again, summary judgment, reasonable inferences. You have the non-recognition that has probably three, I'll say, acts that would dissuade a reasonable person from pursuing a charge of discrimination. First off, it's essentially stifling career advancement. It's the first step in, you know, Mr. Fancher, he's not going to go right to termination. Instead, he's going to build the record. You start by building the record by not really relaying the facts. And the fact was, at that time, Mr. Berry had the highest arrest records, despite all of the things that he was dealing with as a result of his leadership. Two, so you have the stifling of career advancement. The other part of this non-recognition is that it, you know, it weakens your reputation among peers. He's the, again, the highest arrest records. You have these new peers coming in, but he's not referred to them. So what do those peers think? And then you have the effects on Mr. Berry and his, you know, his confidence as a law enforcement officer. You know, why am I continuing to do this if I, you know, don't get the recognition? Then more importantly, it's okay. So I know that I have the highest arrest records. I'm not being recognized. What's next? When's the other shoe going to fall? So does that answer your question, Your Honor? Thank you, Counsel. Counsel, I don't think this is in your materials, but I just want to clear this up. There doesn't seem to be an allegation that there was retaliation from taking the knee by his transfer to New Mexico. Is that right? That's correct, Your Honor. You don't allege that? Yeah, he's not, that's not retaliation, yes. All right. Any other questions? No. Thank you, Your Honor.  Good morning, and may it please the Court. Counsel. Paige Messick on behalf of the Attorney General. Ms. Messick, do you accept that the non-recognition of workplace accomplishment was an exhausted claim? The non-recognition of workplace accomplishment was exhausted. He did mention it in the EEO complaint. That was what the district court called his sole timely and exhausted accusation. But as Judge Matheson just alluded to, it does not constitute an adverse employment action under the case law. Was that a theory that was advanced by the government below, or was that a theory that the district court used to deny the claim? Both. I believe that the government advanced that theory very briefly in some of the later pleadings, and it may have even been in footnotes. The district court then did say this is not enough for retaliation or hostile work environment claim. And Barry has never suggested – Footnotes in what document? Are you talking about this? I'm not aware that that – it appeared to me that the district court used that itself. I don't have it before me right now, but I can try to point – I can try to find that in the record if it's important to the court. I don't want to take your time to do that right now. Let me – why don't you talk about – to the extent that the adverse action or not is on the table here, what do you make of the argument that you just heard from opposing counsel as to the nature of why that would chill a reasonable person? If I may just first note that even if the district court did come up with this itself, Barry has never objected to that on appeal. But as to whether this can be an adverse action that's sufficient to sustain a retaliation claim or if it's standing alone in a hostile work environment, no, it's not. And I would point to this court's decision in Stover in which an employee did not receive a performance award and was not assigned a special project that he thought that he was best suited for, or it may have been she, I'm not entirely sure. In any case, the court in Stover said that's not enough for a retaliation claim. And Mr. Barry's argument here that it is enough to be not invited to lunch, this is the first time that I've heard him raise any kind of argument like that. He didn't engage with Burlington Northern at all in his reply brief. But I think that under Stover, it's quite clear that this kind of petty slight, which this is at most a petty slight, is not enough to sustain either of these types of actions. Also, the court's case in Morris said that sort of sporadic comments demeaning an employee's quality of work are not enough to sustain a retaliation kind of claim. So this is his sole timely and exhaustive complaint, and he cannot meet the standards to show, to establish either of those claims. Isn't he also trying to sweep in statements, alleged hostile work environment statements, by hitching it to the timely non-recognition claim? Indeed, he is trying to do that. So first, we don't believe that the non-recognition is alleged in the hostile work environment claim. So if you're looking at his amended complaint, there's nothing in there that would give you the idea that non-recognition was part of his hostile work environment claim. But even if you say, okay, let's say that it's there, he can only make this timely by hitching it to the non-recognition. If the non-recognition is of the same, is sufficiently related to the other acts that are alleged to constitute the hostile work environment, to be part of the same kind of environment. And this is the Morgan case. And under the Morgan analysis, he looks to factors like the nature of the acts, the perpetrator, and when they occur. And here, the other acts that he has alleged that constitute the hostile work environment are all overt racist comments. You look at the allegations are that Bill Hall said, no, there should be no interracial marriage. People who knelt at these protests should be killed. He's going to be a problem because he's interracial. These are the kind of comments that are the bulk of the hostile work environment claim. And then you compare that to the allegation that Fanter told a new agent to go ask questions of two other people. Not even instead of Berry. This comment had nothing, did not even allude to Berry. But when you take this non-recognition, you compare it to those other racist comments, you see that there is one thing that is not like the others here. And just as in this court's case in Tadimi, these are just qualitatively different kinds of acts. In Tadimi, for instance, it was not enough that there was racist graffiti, racist epithets, a noose around a clock. That was not enough to pull in another race-related incident of physical intimidation, even though they all shared that common thread. There has to be something stronger to link them there. Counsel, with regard to exhaustion, Mr. Berry, at least on this appeal, is alleging, and he's alleging this was not addressed by the district court, he's alleging that he timely exhausted a claim that he was retaliated against in his complaint by the proposed dismissal. And he says the judge didn't address that. So he says he got the dismissal letter or the proposed dismissal letter in January of 2023. He did submit his complaint within the time, if that's considered. What's your response to that? Our response to that is that allegation is not in the amended complaint. It is not one of the discrete acts of retaliation or discrimination that he lists in his amended complaint. So we would agree that if the alleged proposed termination, if his amended complaint alleged that, then yes, that would be something that was exhausted. It was in his EEO complaint. But in this instance, his problem is that he did not carry this allegation from his EEO complaint forward to his amended complaint. He lists specific actions as his discrete acts of adverse employment actions, and he doesn't include that. Now, the government, the Bureau pointed that out below, and he essentially ignored that point. On appeal, we pointed out again when he says, hey, the district court ignored this, and we pointed out that's because it wasn't in the amended complaint. And he finally, in reply, brings up liberal pleading standards as if to say you should read my amended complaint to encompass the proposed termination, even though he specifically listed out things that were not the proposed termination. But even under liberal pleading standards, even under notice pleading, we still need to have notice of what these claims are. The identity of his adverse employment actions is a crucial piece of his claim, and it shouldn't be a moving target. It's not something that he can change up in his briefing. I also wanted to touch, while we're on the discrimination and retaliation claims, on the idea of notice to Barry, with Barry's idea being that if he didn't have notice of the 45-day requirement, then he didn't have to follow it. But he is raising this argument in the wrong forum. If you think you don't have notice of the 45-day requirement, you can ask the administrative agency for an extension, and one of the grounds that you can ask for an extension on is that you didn't have notice and you were not otherwise aware. But he never asked the agency for an extension, and he's never argued below or on appeal that the agency abused its discretion in not sua sponte, offering him an extension for his untimeliness. What about that regulation that he just cited? What did we do with that? The one where supposedly the FBI had a regulation that allowed him, if he faced racial discrimination and was concerned about raising it with his immediate supervisor, he could raise it with somebody else. Why didn't that allow him to exhaust his racial discrimination claims? So Mr. Barry is selectively citing to one page of that harassment policy, but if you flip forward, I think, about two pages, you will see that it says that someone who is attempting to raise a claim that they have been the victim of this type of environment must take that to the EEO counselor within 45 days. And so he wants to point to one piece of the harassment policy without reading even the entirety of the same section, in which this 45-day requirement is clearly stated, as it was clearly stated in the No Fear Act training that he received three or four times before he made it to an EEO counselor. Nice segue. I was just going to ask you, on the No Fear Act, is the question of whether it's sufficiently clear, is that a question of law or is that a question of fact? I don't think that whether the No Fear Act slides are sufficiently clear is really at issue at all as a question of law or fact, because this is basically another argument that he should have taken to the agency, to the OEOA, asking for an extension. Basically, I didn't know that it was a 45-day requirement because your training was bad. But he didn't do that, and he hasn't asked for it. He's never asked for anybody, the district court or this court, to review the agency's lack of sua sponda action here. I also wanted to discuss this Glickman case that he relied on in his reply brief for the first time on appeal and then an oral argument here. That's a 2001 district court case from the District of Kansas that says essentially the EEOC employs a close enough rule under which it considers that 45-day standard to be met if the employee contacts agency officials. An agency official who is logically connected with the EEO process demonstrates an intent to begin the process, the EEO process that is, and then alleges some sort of discrimination. But the Tenth Circuit has never adopted this standard. Tenth Circuit precedent, such as in Hickey, says that you must contact an EEO counselor unless you do something close enough. And the court should not adopt that standard here because the 45-day regulation at 1614.105 isn't ambiguous. There's no reason to look to what the EEOC has employed here. That regulation doesn't include anything like a close enough, logically connected type of provision. And even if you did apply the Glickman standard, Barry can't meet it anyway for the reasons that the district court explained. If the court has any further questions, I would be happy to address them. If not, I will see the rest of my time. Thank you. I think, counsel, you used all your time. So case is submitted and the court will be in recess until 9 a.m. tomorrow.